# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TERRY W. CHELGREN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 6931 |
| | ) | |
| SOUTH HOLLAND SCHOOL DISTRICT | ) | |
| No. 150, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Terry Chelgren, a white woman, brings this action for race discrimination against her employer, South Holland School District 150, under 42 U.S.C. § 1981 and Title VII. Plaintiff alleges that Defendant discriminated against her by demoting her and hiring a less-qualified African-American applicant to fill the position of Media Specialist/ Librarian at the McKinley Elementary School, where Plaintiff works. Defendant has moved for summary judgment.

## BACKGROUND

### I.    Plaintiff Chelgren's Professional Background and Experience

Defendant South Holland School District 150 (the "District") is a municipal corporation organized under the laws of Illinois. The District operates the McKinley Elementary School, Greenwood Elementary School, and McKinley Junior High School. (Def. 56.1 ¶ 2.) Chelgren, who is white, is currently employed as a full-time library aide at McKinley Elementary School. (Def. 56.1 ¶ 7.) She holds a bachelor's degree in education from Northern Illinois University and is certified to teach children from kindergarten through twelfth grade.[1] (Pl. ¶77; Def. 56.1 ¶ 8.) In addition,

---

[1]    The parties and deponents frequently use "certificate" and "endorsement" interchangeably. The terms in fact appear to have distinct meanings. According to the Illinois State Board of Education, a "certificate" authorizes the holder to teach a specific class of students, such as "elementary level" (kindergarten through grade nine), "secondary level "(grades six through twelve) or special education. *See* http://www.isbe.state.il.us/certification/html/types.htm. An "endorsement" is a statement on the face of a certificate that identifies a specific subject or subjects
(continued...)

Chelgren has a standard special teaching certificate valid for kindergarten through twelfth grade and endorsements as a "Trainable Mentally Handicapped and Learning Behavior Specialist I" and an endorsement in "Self-Contained General Education." (Def. 56.1 ¶ 9.)

Chelgren began her employment at McKinley Elementary School in 1994 as a Library Aide. From 1994 through 1996, she worked two days per week and shared the position with another aide, who worked the other three days each week. (Def. 56.1 ¶ 7.) Neither party has described Chelgren's duties as a Library Aide during this period. During the 1996-1997 school year, Chelgren's job title changed to "Learning Center I Supervisor"; she held this part-time position until the 2005-2006 school year. (Def. 56.1 ¶ 7; Chelgren Employment Contract, Def. Ex. Y.) Chelgren claims that this change in title in fact constituted a promotion from the position of Library Aide to Librarian. (Def. 56.1 Resp. ¶ 77.) As Learning Center I Supervisor, Chelgren's duties included ordering and processing books, maintaining accurate records, and maintaining an inventory of the library's collection. (Chelgren Dep. 21:24-22:21, Smith Dep. 13:3-17.) Chelgren considered these duties equivalent to those of an elementary school librarian, not a library aide. (*Id.*) Chelgren's salary was based on the full-time teacher's pay scale, not the aide's pay scale; that is, she received two-fifths of a teacher's pay for the two days she worked each week.

For its part, Defendant contends that the full-time position of Librarian did not exist until the 2006-2007 academic year, and that until that time, Chelgren worked as a part-time aide. While Chelgren did have supervisory authority over at least two other Library Aides, it is unclear from the record whether her duties otherwise changed after her change in title. (Pl. 56.1 ¶ 78; Def. 56.1 Resp. ¶ 78.) Chelgren continued to work only two days per week and was not a member of the

---

[1](...continued)
the certificate holder has become authorized to teach through additional coursework in that area. *See* http://www.isbe.state.il.us/certification/html/endorsement.htm. For example, a person with a certificate qualifying him to teach secondary-level students may also hold an endorsement in, for example, computer science, foreign languages, social science, speech, or media.

teacher's union, though she was subject to the union's collective bargaining agreement. (Pl. 56.1 Resp. ¶ 15.) Both Dr. Jerry Jordan, the Superintendent of School District 150, and Michelle Coleman, the Assistant Principal at McKinley Elementary School, testified that, despite the change in title, they considered Chelgren a Library Aide at the time the Media Specialist/ Librarian position was created. (Jordan Dep. 16:13-16; Coleman 28:9-12.)

## II.     The Requirements of the Media Specialist/ Librarian Position

Defendant receives federal funding and therefore must comply with the No Child Left Behind Act ("NCLBA"). In 2006, in an effort to conform with NCLBA standards, Defendant created the full-time position of Media Specialist/ Librarian. (Pl. 56.1 ¶ 21; Harris Dep. 133:24-134:8.) The qualifications for the position of "Media Specialist" under the NCLBA are implemented through the Illinois School Code and various provisions of the Illinois Administrative Code. *See generally* 105 ILCS 5/2-3.25n; 23 Ill. Adm. Code 1.720. For the position of Media Specialist, Illinois law sets forth the following standards for certification and endorsement:

> (a)(5) Persons first employed on or after September 1, 1978, as media professionals or library information specialists serving any of grades 5 through 8 are required to have completed 18 semester hours in the field that address administration, organization (cataloging and classification), reference, and selection of materials, provided that the individual completes all the required coursework on or before June 30, 2006, or has applied for the endorsement on or before June 30, 2006, and completes any coursework identified on a related deficiency statement no later than one year after the date of that statement. New requirements for an endorsement in this field apply to persons who have not qualified on the basis of 18 semester hours; see also 23 Ill. Adm. Code 25.100 and Section 1.755 of this Part. The provisions of subsection (a)(2) of this Section notwithstanding, no individual who has completed only nine semester hours in the field may serve in this capacity unless assigned pursuant to 23 Ill. Adm. Code 25.464.

23 Ill. Adm. Code § 1.720 (2008). A teacher who failed to complete the required coursework under § 1.720 by June 30, 2006, must meet the requirements set forth in 23 Ill. Adm. Code § 1.750 (2008), which provides, in relevant part:

Preparation of Person Providing Media Services
. . .
b) Media Specialist: responsible for both library and audio-visual services to students, teachers and other school personnel.

Standard Special Certificate with Library Science - Media (instructional materials) Teaching Endorsement. Work in field: 32 semester hours in media (instructional materials, library science, audio-visual) including professional preparation (at four-year college and/or graduate levels) in administration, organization (cataloging and classification), reference and selection of materials for both elementary and secondary levels, production and communications.

Should the school be unable to find a fully qualified Media Specialist, 23 Ill. Adm. Code 25.464 allows for provisional hiring, so long as the provisional hire eventually completes certain requirements:

25.464 Short-Term Authorization for Positions Otherwise Unfilled

Subject to the provisions of this Section, an entity that is required to employ certified teachers may receive short-term approval to employ an individual who does not hold the qualifications required for a vacant teaching position, other than a special education teaching position, when the employing entity has been unable to recruit a fully qualified candidate for that position. Short-term authorization as described in this Section shall be available not only with respect to individuals who lack full qualifications in a subject area, but also with respect to individuals who have not completed the six semester hours of coursework specified at 23 Ill. Adm. Code 1.720 for teachers of middle grades

23 Ill. Adm. Code 25.464

While these provisions help illuminate what it means to be a fully-qualified Media Specialist in the Illinois public schools, the requirements Defendant had in mind when it created the position are less clear. No written description of the position or its prerequisites existed at the time of the interview and, according to Assistant Principal Coleman's testimony, applicants were not informed of the specific duties of the position until interviewed. (Pl. 56.1 ¶ 83; Coleman Dep. 44:15-17.) Harris and Coleman did testify that the District school board had specifically requested a "certified media specialist," that is, someone certified in the library sciences as defined by the NCLBA, for the position. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 84.)

The process for hiring new personnel in South Holland School District 150 begins with the

screening of individual candidates by the principal and assistant principal, both of whom were African-American when Chelgren applied for the Media Specialist/ Librarian position. (Graham Dep. 19:19-20:3.) The principal and the superintendent then recommend candidates to the District's school board, which was also entirely African-American at the time. (Def. 56.1 ¶¶ 20, 35.) Although the school board makes the final hiring decision, the board almost invariably follows the principal's and superintendent's recommendation. Nina Graham, a senior member of the school board, acknowledged that the board "normally" follows the recommendation of the administration; she could not identify a single instance where Board had not adopted the recommendation of a principal or superintendent. (Pl. 56.1 ¶ 85; Graham Dep. at 20:9-13.)

### III.    Defendant Did Not Hire Chelgren for the Position of Media Specialist/ Librarian

On April 24, 2006, Chelgren wrote to Priscilla Palmer, then the Superintendent of School District 150, expressing her interest in the position of "Learning Center I/ Library Teacher." (Letter from Chelgren to Palmer, Pl. Ex. N.) In the letter, Chelgren used the same job title—"Learning Center I/ Library Teacher"— to describe the position she already occupied. (*Id.*) Because the other part-time worker who shared Chelgren's job was retiring in June 2006, Chelgren understood that there would be a full-time position consolidating her coworker's three-day-per-week schedule with her own two-day schedule. (*Id.*) By contrast, Defendant maintains that the position of "Media Specialist/ Librarian" was a "newly created full time position," with a higher salary than Chelgren's existing position, additional benefits, eligibility for tenure, and membership in the teacher's union. (Def. 56.1 ¶¶ 15, 18, 21.)

In June 2006, Principal Harris and Assistant Principal Coleman, both of whom are African-American, interviewed Chelgren for the Media Specialist/ Librarian position. At the time she applied, Chelgren did not have an endorsement, certification, or any kind of degree or degree credits in library science, nor was she enrolled in courses to obtain an endorsement or certification. (Def. 56.1 ¶¶ 10-12, 22; Chelgren Dep. 11:17-12:6, 12:10-24.) It is not clear from the record

whether Harris or Coleman knew before the interview that Chelgren did not have the required endorsement. but it is undisputed that during the interview, Coleman did tell Chelgren that the position required a "certification" in the library sciences. (Def. 56.1 ¶ 23; Pl. 56.1 Resp. ¶ 23.) Chelgren told Coleman she would be willing to obtain a certification in library science using her own funds if she were offered the Media Specialist/ Librarian position, but could not afford to work toward the degree without a full-time teacher's pay. (Chelgren Dep. 43:7-24, 44:19-45:3, 49:17-50:8.) Following the interview, Chelgren sent a letter to Coleman and Harris dated June 20, 2006, thanking them for the interview and discussing proposed improvements to the library. (Def. 56.1 ¶ 25.)

Coleman and Harris did not recommend Chelgren to the school board for the Media Specialist/ Librarian position. (Def. 56.1 ¶ 26.) Harris testified that his reason for not recommending Chelgren was that "she knew how to run the library, but she didn't have the credentials that the board asked us to look for . . . ." (Def. 56.1 ¶ 27, Harris Dep. 29:10-12.) Coleman concurred that Chelgren lacked the credentials, and she and Harris did not consider Chelgren a qualified candidate. (Def. 56.1 ¶ 23.) On June 30, 2006, Harris and Coleman sent Chelgren a letter stating that another candidate had been selected. (Pl. Ex. Y.) Soon after, Superintendent Jordan, who is also black, offered Chelgren a full-time position as a Library Aide, a/k/a Media Assistant, for the 2006-2007 term. Chelgren accepted the position, though she viewed the change as a demotion. (Pl. 56.1 ¶¶ 77, 80; Pl. 56.1 Resp. ¶ 7.) Indeed, as a full-time Media Assistant/ Library Aide, Chelgren was compensated on the "aide" scale rather than the teacher's pay sale. She thus earned an annual salary of $22,191.00 for the 2006-2007 school year, an amount only slightly higher than the salary she had been earning in the two-day-per week position she had held prior to the 2006-07 school year. (Jordan Dep. 21:3-13, 22:9-15.) Before accepting the full-time job, Chelgren requested a higher salary, but according to Jordan, her request was denied because the salary she was offered was within range for assistants and aides at South

Holland School District 150.  (Def. 56.1 ¶ 39.)  Chelgren later received a salary increase to $23,078.64 for the 2007-2008 school year.  (Def. 56.1 ¶ 40.)

In 2007, Defendant offered Chelgren full-time positions as a fifth grade teacher or special education teacher for the 2008-2009 school year; although the record does not reveal the pay she would have earned in those slots, the court presumes they were at the teacher's pay scale.  (Def. 56.1 ¶ 63; Pl. 56.1 Resp. ¶ 63.)  Chelgren declined the special education position because she had not worked in special education for approximately thirty years.  She refused the fifth-grade assignment, as well, because she believed Coleman, who was then the principal at McKinley Elementary, would "pick on" her.  (Chelgren Dep. 158:10-159:7.)  Chelgren did express interest in a position at the Greenwood School under a different principal, but this request apparently did not lead to a change in Chelgren's position.  (Chelgren Dep. 158:18-20.)

## IV.    Defendant's Decision to Hire Bernita Smith and Subsequent Events

After interviewing at least three or four candidates in addition to Chelgren, Harris and Coleman initially offered the Media Specialist/ Librarian position to Patricia Murray, a white woman who possessed an endorsement in library science, at an annual salary of approximately $43,000. (Def. 56.1 ¶ 38.)  Murray turned down the job for monetary reasons.  (*Id.*; Murray Dep. 18:2-20:11.0)  Harris then recommended Bernita Smith, an African-American woman, for the Media Specialist/ Librarian position.  (Def. 56.1 ¶ 31.)

In her application, Smith included a resume and transcripts from Chicago State University showing she had a Master's degree in library science. (Def. 56.1 Resp. ¶ 101.)  Smith's resume listed an endorsement in library science (also referred to as a "certification in library science" or an "endorsement as a Media Specialist") for kindergarten through twelfth grade.  (Jordan Dep. 60:22-61:5.) Smith did not produce a copy of her teaching certificate, which would have included the endorsement on its face, at her interview.  (Def. 56.1 ¶¶ 33, 45.)  Based on the representations in Smith's resume, Principal Harris and Superintendent Jordan believed she had the proper

endorsement and recommended Smith to the school board. (Def. 56.1 ¶ 35.) Jordan testified that it is not unusual for the District to allow new hires time to provide documents authenticating their credentials. (Jordan 63:17-64:1.)

In fact, Smith did not have the necessary endorsement for the position and had falsified her resume, a fact that came to light only after the Regional Office of Education told Harris that Smith was two classes, or six credit hours, short of an endorsement as a media specialist. (Def. 56.1 ¶ 46; Def. 56.1 Resp. ¶ 100.) Exactly when the Regional Office of Education contacted Harris is unclear, but beginning in October 2006, Patricia Sander, McKinley Elementary School's business coordinator, placed at least three letters in Smith's personnel file noting that the school had not yet received a copy of her teaching certificate. (Pl. 56.1 Resp. ¶ 46.) One of these letters was addressed directly to Harris. (Pl. 56.1 Resp. ¶ 47.) Smith did not produce her teaching certificate, which revealed that she lacked the proper endorsement, until May 18, 2007, almost a full year after being hired. (Pl. 56.1 Resp. ¶ 46.) Because she possessed a master's degree, Smith did have 12 hours in coursework credit toward the required certification when she became the Media Specialist/ Librarian. At some time unspecified in the record, Superintendent Jordan contacted the Illinois State Board and learned that the state would permit a teacher to work in the Media Specialist/ Librarian position if she had at least 12 hours toward certification, provided she eventually completed the required coursework for certification as a Media Specialist.[2] (Def. 56.1 ¶ 47.) Plaintiff does not dispute this, beyond observing that Superintendent Jordan could not recall the identity of the person he spoke to at the Illinois State Board. (Pl. 56.1 ¶ 47.)

Despite Smith's falsification of her credentials, the District retained her for a second term. If a school administrator does not recommend a teacher's termination, the school board

---

[2] Although Jordan did not mention the regulation in his deposition testimony, the court notes this information is consistent with the language of 23 Ill. Adm. Code 25.464.

automatically renews his or her contract. (Jordan Dep. 71:2-11.) When Smith's contract came up for renewal in June 2007, Superintendent Jordan did not recommend Smith's termination, and her contract was consequently renewed. (Pl. 56.1 ¶ 102; Def. 56.1 ¶ 102; Def. 56.1 Resp. ¶ 105; Coleman Dep. 106; Jordan Letter to Smith, Pl. Ex. S.) Dr. Jordan placed a letter to Smith in her personnel file in which he expressed his "disappointment" that Smith "intentionally mislead [*sic*] the administration to believe that you were certified as a media specialist" and warned her that she must complete the required coursework by January 2008 or face termination at the end of the 2007-2008 term. (Jordan Letter to Smith, Pl. Ex. S.) Smith was not otherwise reprimanded or disciplined for the false information in her application.

She was, however, the subject of discipline for poor performance. On June 11, 2007, Coleman placed a letter in Smith's file regarding the mismanagement of library funds. (Pl. 56.1 ¶ 106; Coleman Memorandum, Def. Ex. L.) The letter placed certain restrictions on Smith's access to library funds due to "her lack of honesty with funds and overall integrity." (Pl. 56.1 ¶ 106.) These restrictions included a ban on Smith's collecting any money in the library, such as fines or book fees; a requirement that Smith be "assisted, by *a reliable adult*, in operating the book fair;" and a prohibition on the purchase of any items without an administrator's approval. (Coleman Memorandum, Def. Ex. L (emphasis in original).) Thereafter, according to Smith's testimony, it was Chelgren who handled all library funds. (Smith Dep. 92:3-8.)

There is also evidence that Smith lacked the basic skills to perform her job as a Media Specialist/ Librarian. In September 2007, Assistant Principal Coleman met with Smith about her failure to process library books before the beginning of the fall 2007 term and granted her an extension until October 31, 2007 to get that work completed. (Coleman Dep. 100:11-19, 103:12-15.) On November 6, 2007, Coleman placed a memorandum in Smith's file for unsatisfactory work performance. (Def. 56.1 ¶ 50, Work Performance Evaluation, Def. Ex. N.) Thereafter, Defendant hired a "Ms. Simms" to assist Smith in processing books. (Pl. 56.1 ¶ 95; Coleman Dep. 103:20-

104:5; Jordan Dep. 74:4-12.)  At the end of the 2006-2007 school year, Smith's paycheck was held back.  Jordan testified that this is a common practice when a teacher fails to complete tasks requested by the principal by the end of the academic year. (Jordan Dep. 52:4-53:6.)

Even with the assistance of Ms. Simms, Smith continued to fall behind in her duties and even began hiding unprocessed books. (Chelgren Dep. 74:21-22, 83:16-21; Coleman Dep. 87:16-88:16.)  According to another teacher at the school, when Smith was in charge, students were asked to reshelve and check books back into the library, and other teachers were asked to help maintain and organize library records.  (Pl. 56.1 94; Thompson Dep. 20:11-21:11, 24:10-25:23.) Principal Harris personally witnessed Smith's inability to file cards in the card catalog alphabetically and testified that he was dissatisfied with Smith's overall performance at McKinley.  (Pl. 56.1 ¶ 97; Harris Dep. 113:1-114:7.)  According to Chelgren, Coleman complained to her at the end of the 2006-2007 academic year about problems in the library and told her to work on her library science certification, a statement Chelgren took to mean she should prepare to take over the library. (Chelgren Dep. 49:17-23.)

On November 14, 2007, Chelgren filed a charge of discrimination with the Equal Opportunity Employment Commission, alleging that in June 2006 Defendant demoted Chelgren from Librarian to Library Aide in favor of a less-qualified African-American individual.  (Def. 56.1 ¶ 64.)  Chelgren admits that she initially attributed her alleged demotion to her lack of a certification in library science, not race discrimination, but says she came to believe that Smith's selection for the position was racially motivated after witnessing the preferential treatment afforded Smith by the predominantly African-American administration at McKinley Elementary School, specifically Jordan, Harris, and Coleman.

On December 14, 2007, Smith officially resigned her position as Media Specialist/ Librarian. (Def 56.1 ¶ 57.) There is no evidence in the record that she was asked to resign.  In fact, Jordan asked Smith to work through the remainder of 2007-2008 school year, and Smith continued working

in the library through the end of the spring term.  (Jordan Dep. 80:20-81:2; Smith Dep. 10:19-20, 104:19-24.)

## V.     Evidence of Other Incidents of Discrimination

Chelgren has also adduced evidence of other alleged instances of discrimination at McKinley Elementary School.  First, Chelgren claims she was intentionally left off an e-mail list of individuals to be notified about a new part-time position to fill the vacancy created by Smith's resignation in December 2007.  The e-mail was sent at Jordan's direction through his administrative assistant, Beverly Walters.  (Walters Dep. 10:6-23; Job Vacancy E-mail Announcement Ex. 1 to Walters Dep.)  Walters testified that she used a group listserv already in the school's computer system, and that other educators were also inadvertently left off the list.  (Def. 56.1 Resp. ¶107; Walters Dep. 13, 14:10-14, 15:14-23.)  The open position was also posted on the school's website. (Walters Dep. 11:17-21.)  Chelgren learned of the position when another employee forwarded the e-mail to Chelgren.  (Chelgren Dep. 120, 130.)  Chelgren applied by submitting her resume to Walters; however, because Superintendent requested Smith to work through the end of the school year, the position remained unfilled.  (Pl. 56.1 ¶ 108; Pl. 56.1 Resp. ¶ 62.)

Second, Plaintiff alleges that Carla McCall, an African-American teacher's aide, received overtime pay for work beyond her scheduled daily hours.  (Pl. 56.1 ¶ 82.) Defendant admits that for a period of time McCall did receive overtime pay, but McCall was not entitled to overtime pay, and the payments stopped after the error was brought to Coleman's attention.  (Def. 56.1 Resp. ¶ 82; Coleman Aff. ¶¶ 7-10.)  Defendant further notes that no other aides received overtime pay for performing similar duties.  (Coleman Aff. ¶¶ 11-13.)  Both Smith and Chelgren at some time requested and were denied overtime pay for work beyond their scheduled hours.  (Coleman Aff. ¶¶ 12-13.)

Finally, several teachers testified about specific instances of alleged discrimination against white teachers and against black teachers who objected to the alleged discrimination.  Sheryl

Phillips, an African-American assistant principal at McKinley Elementary School from June 2007 through May 2008, testified at length about her personal experiences of discrimination at the school. (Pl. 56.1 ¶ 109.) Specifically, Phillips believed that because she refused to discriminate against white teachers, she was limited to evaluating white teachers only (Phillips Dep. 75:14-76:4), excluded from administrative meetings (*Id.* 78:21-79:19), forced to act as hall monitor, and required to perform secretarial duties beneath her position as assistant principal. (*Id.* 79:24-80:5.) While Phillips admits she was never explicitly told to discriminate against any racial group, Coleman directed her to lower evaluation scores for two white teachers. (Phillps Dep. 107:3-10 120:12-17.) Coleman attests that any decision to lower a teacher's evaluation score was not motivated by race. (Def.56.1 Reply ¶ 111; 2d Coleman Aff., Def. Ex. BB ¶ 7.) Phillips believes that her own insistence on treating white teachers fairly led to her termination just one year into her employment. Phillips filed a lawsuit alleging termination in retaliation for her refusal to discriminate against Caucasians, which was voluntarily dismissed on Phillip's motion on April 16, 2009. *See Phillips v. South Holland School District #150*, No. 08 C 04140 (N.D. Ill. April 16, 2009). (Complaint, Pl. Ex. AE.) Phillips was not an employee in June 2006 and knows nothing about the decision to hire Smith as the Media Specialist/ Librarian. (Def. 56.1 Resp. ¶ 109.)

Several white teachers at McKinley Elementary School also testified about hiring decisions involving what they believed to be disparate treatment. (*See* Pl 56.1 ¶¶ 109-116.) One former Caucasian teacher filed a charge of discrimination against Defendant in November 2005, but this complaint predates when Coleman or Jordan began working for the District. (Pl. Ex. AF.) Some time during the 2006-2007 school year, a white aide applied for and was passed over for an aide position at the District in favor of a black teacher who had been with Defendant for less time. (Pl. 56.1 ¶ 114; Def. 56.1 Resp. ¶ 114.) During the 2006-2007 school year, a less-experienced African-American teacher was promoted to the position of summer school principal over Mike Wachel, a Caucasian teacher who had been with Defendant for thirty years and who had  served as summer

school principal for seven or eight of the previous years. (Pl. 56.1 ¶ 115; Def. 56.1 Resp. ¶ 115.) According to Chelgren, the position is customarily awarded based on seniority, an assertion which Defendant denies and which Chelgren has failed to support with any evidence of Defendant's policies regarding seniority. (*Id.*) Another white instructor testified that she believed Phillips to be the only administrator who did not let race influence her decisions, but when pressed, could not identify any specific administrator who she believed made decisions based on race. (Pl. 56.1 ¶ 111; Stofco Dep. 56:6-12, 59:4--60:14.) Still other teachers described a "feeling" of racial tension at the school due to voluntarily segregated lunches among teachers. (Pl. 56.1 ¶ 112; Stofco Dep. 92:13-19; Wachel Dep. 66:20-67:6.)

Several deponents also related remarks by Joe Ingram, the school's Dean of Discipline, during an April 2008 faculty meeting. Although these accounts differ, Ingram reportedly made a statement to the effect that if "you teachers" cannot teach "our kids" then "you" should leave the school. A number of teachers in attendance interpreted "you teachers" to mean white teachers, and "our kids" to mean black students. (Pl. 56.1 ¶ 116; Phillips 102-104; Thompson 87:9-88:3; Stofko 90:6-16; Wachel 70:15-23.) According to Phillips's deposition, after the meeting Coleman told Phillips that she agreed with Ingram and that the school would be better off without white teachers. (Pl. 56.1 ¶ 116.) Coleman denies ever making such a statement. (2d Coleman Aff.)

## DISCUSSION

Chelgren alleges race discrimination in violation of 42 U.S.C. § 1981 and Title VII of the United States Code. Both of her counts rest on her claim that Defendant subjected her to discrimination on the basis of race when it hired and retained Bernita Smith, an African-American with inferior qualifications and experience, for the position of Media Specialist/ Librarian. Defendant now moves to dismiss Count II as time-barred and seeks summary judgment on Count I under Rule 56(c) of the Federal Rule of Civil Procedure. Because Chelgren's § 1981 claim is unquestionably timely, the court will address the claim on its merits in any event. Before doing so, the court pauses

to explain its conclusion that the Title VII claim is indeed time-barred.

## I.    Count II: Plaintiff's Title VII Claim Is Time-Barred

Under Title VII, a charge concerning a discrete act of discrimination must be filed with the Equal Employment Opportunity Commission within 300 days of the act's occurrence.  42 U.S.C. § 2000e-2(a); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *Roney v. Illinois Dept. of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007).  As the Supreme Court explained in *Morgan*, "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges."  536 U.S. at 113.  Rather, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," and that clock starts on the day the act occurred. *Lucas v. Chicago Transit Authority*, 367 F.3d 714 (7th Cir. 2004) (quoting *Morgan*, 536 U.S. at 113).

Chelgren filed a charge of discrimination with the EEOC on November 14, 2007. (Def. 56.1 ¶ 64.)  Thus, only acts occurring before January 19, 2007—300 days prior to the filing of the charge—are actionable under Title VII.  Here, Chelgren makes the following allegation:

> In June 2006, Respondent demoted me from my position as a Librarian to Library Aid (*sic*) in favor of a substantially less qualified African-American individual despite my twelve (12) years of dedicated service.

("Charge of Discrimination," Def. Ex. Q.)  A charge of demotion or a failure to promote qualifies as a discrete act of discrimination, and here the alleged demotion occurred more than 300 days before Chelgren filed a charge with the EEOC.  *Roney*, 474 F.3d at 460.  In her response to Defendant's Motion for Summary Judgment, Chelgren attempts to duck this hurdle by arguing that her Title VII claim relates "to Defendant's decision to renew Smith's contract, and again relegate Plaintiff to the Aide position prior to the 2007-2008 school year."  (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. (hereinafter "Pl. Mem.") at 4.)  Chelgren contends that the June 2006 "demotion," though outside the limitations period, should be considered as evidence supporting a claim based on the renewal of Smith's contract in 2007.  In other words, Chelgren attempts to preserve her Title VII claim by arguing that the later contract renewal constitutes a discrete act of discrimination.

14

Chelgren's late attempt to find a second discriminatory act will not turn the mere renewal of Smith's contract into an actionable claim. Chelgren herself did not characterize the decision to renew Smith's contract as a separate act of discrimination until Defendant challenged the timeliness of her Title VII claim. Rather, Chelgren's allegations in her charge of discrimination focus entirely on the alleged "demotion" in June 2006. Further, Chelgren did not personally suffer any adverse employment action as a result of the renewal of Smith's contract, as it had no effect on Chelgren's job as a library aide. Defendant did not, as Chelgren seems to suggest, demote Plaintiff a second time. If Chelgren suffered disparate treatment, it occurred when both women applied for the same position, and Defendant chose Smith over Chelgren for improper, racially discriminatory reasons. Because this act occurred more than 300 days before Chelgren filed the charge of discrimination, her claim under Title VII is untimely.

II.     **Count I: Plaintiff Fails To Establish a *Prima Facie* Case of Discrimination Under 42 U.S.C. § 1981**

Summary judgment is appropriate if the evidence demonstrates that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To determine whether a genuine issue of fact exists, the court must evaluate all admissible evidence in the light most favorable to the non-moving party; on summary judgment, the court may not make credibility determinations or weigh evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). If a reasonable jury could find for the nonmoving party, summary judgment is inappropriate. *Lawson v. Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001).

To survive summary judgment on a § 1981 claim, a plaintiff may proceed under either the "direct" or "indirect" methods of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633 (7th Cir. 2008); *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900 (7th Cir. 2006). The direct method involves direct evidence, "such

15

as near admissions by the employer, as well as more attenuated circumstantial evidence that 'suggests discrimination albeit through a longer chain of inferences.'" *Faas*, 532 F.3d at 641, quoting *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir.2007). Alternatively, the plaintiff can prove her case under the indirect method, by presenting evidence of "a certain subset of circumstantial evidence that includes how the employer treats similarly situated employees, and 'conforms to the prescription of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).'" *Id.* quoting *Hemsworth*, 476 F.3d at 490-91.

Lacking evidence sufficient to proceed under the direct method, Chelgren must proceed under the indirect approach, by presenting evidence of the following *prima facie* elements: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside the protected class more favorably. *See Goodwin v. Bd. of Trs. of Univ. of Illinois*, 442 F.3d 611, 617 (7th Cir. 2006). In a failure-to-hire case, a plaintiff may also meet her burden under the fourth prong by showing that she was qualified for the promotion and that "after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Pantoja v. Am. NTN Bearing Mfg. Corp.* 495 F.3d 840, 845 (7th Cir. 2007) quoting *McDonnell Douglas*, 411 U.S. at 802. If Plaintiff succeeds in establishing each of these elements, Defendant may rebut the inference of discrimination by presenting a legitimate, nondiscriminatory reason for the challenged action. *Id.* If it does so, Plaintiff bears the burden of presenting evidence sufficient for a reasonable trier of fact to conclude that Defendant's proffered reason was pretextual. *Id.* at 17-18. Defendant does challenge Plaintiff's qualifications for the position of Librarian, but concedes that Chelgren's performance as an aide is not at issue. The court therefore turns to the three remaining elements of Plaintiff's *prima facie* claim that her demotion, and the District's failure to appoint her to the position of Librarian, were a function of race discrimination. (Pl. 56.1 ¶ 79; Defs' Ans. to Pl.'s First Set of Interrogatories ¶ 6, Pl. Ex. Z.)

### A.     Plaintiff's 2006 Demotion Constitutes Adverse Action

As a white woman, Chelgren is indisputably a member of a protected class, particularly when one considers that the individuals with decision-making power in this case–Superintendent Jordan, Principal Harris, Assistant Principal Coleman, and the entire District school board–are all African-American.  As noted, Chelgren's performance is not at issue. The parties disagree about whether Defendant's alleged adverse employment action against Chelgren was a "demotion," but the court concludes that there are disputes of fact precluding judgment for Defendant on this issue. As Chelgren notes, the following circumstances support the conclusion that she was demoted:

- Chelgren had supervisory authority over other library aides and no direct supervisor; after Smith was hired, Smith became Chelgren's supervisor.

- The full-time aide position came with a salary of $22,191.00, a difference of only $2000 more per year than her previous part-time position as Learning Center I Supervisor.

- Until 2006, Chelgren was compensated on a teacher's (as opposed to an aide's) pay scale because she shared a full-time teaching position with another instructor; when she accepted the position of full-time aide, she was placed on the aide's pay scale.

- In her previous position, Chelgren claims she performed the same duties Smith did as the Media Specialist/ Librarian.

Most significantly, before the challenged employment action, Chelgren performed 40 percent of a full-time library teaching job and received pay proportional to the time worked (two days per week) on a full-time teacher's pay scale.  When she accepted the Media Assistant/ Library Aide position, she received full-time pay, but because she was dropped to the aide's scale, she received only a bit more pay for full-time work than she had earned when working part time.  Given the change in Chelgren's supervisory authority and her salary per hours worked, the court concludes that Chelgren has met her burden on the issue of demotion.  *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456 (7th Cir. 2002) (listing factors that may evidence demotion, including "a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices that might be unique to a particular situation." (quoting *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir.1999)).

### B.    The District's Non-Discriminatory Explanation

Although a reasonable jury could conclude that Chelgren was demoted, her claim survives summary judgment only if she can rebut the District's evidence that it had a legitimate non-race-based reason for its action. Defendant explains that when the other teacher who shared Chelgren's position retired, Defendant eliminated the shared full-time position and replaced it, at the direction of the school board, with the new position of Media Specialist/ Librarian. In contrast to Chelgren's previous position, the Media Specialist/ Librarian position was a full-time job and required the additional qualification of certification in the library sciences, which Chelgren did not possess. The job also came with a full-time teacher's salary between $40,000 and $50,000 per year plus additional benefits, including the possibility of tenure, and membership in the teacher's union. Although she had been paid on the teacher's pay scale, Chelgren was apparently not eligible for membership in the teacher's union, and she has produced no evidence that she was eligible for or ever received tenure. While the record does not indicate how the Media Specialist/Librarian position was advertised, the administration interviewed several candidates and offered it to at least one person, a white woman, before recommending Smith to the board.

Defendant is of the opinion that if the court finds the alleged adverse employment action is understood as a failure to promote or hire, Plaintiff's *prima facie* case must fail because Smith and Chelgren were not similarly situated, insofar as Smith and Chelgren did not appear to possess comparable qualifications at the time of hiring. The court agrees. In *Mosley v. Maytag Corp.*, 216 Fed. Appx. 595 (7th Cir. 2007), cited by the District, the defendant employer offered a job to a candidate who was in fact less qualified than the plaintiff, but had falsified his resume to appear to have superior qualifications. *Id.* As the employer was unaware of the "puffing" in the successful candidate's application, the employer's selection of that candidate was based upon his claimed

qualifications, not on his race. Here, similarly, because Smith represented in her interview that she had the required endorsement, she was, so far as Jordan, Harris, and Coleman knew, better qualified for the position than Chelgren. (*See* Def. Mem. at 6.) Although Smith was in fact not qualified for the position, Chelgren was not qualified either; Chelgren had not even begun coursework toward an endorsement or certification in library science.

For her part, Chelgren maintains that she and Smith were similarly situated: Smith, like Chelgren, did not in reality possess a certification in library science. There is, nonetheless, no evidence in the record that the McKinley Elementary School administration knew Smith was unqualified at the time they acted in an allegedly discriminatory manner. Chelgren, apparently recognizing this limitation in her case, couches her claim of adverse action purely as a "demotion," reasoning that if the court concludes that she was already performing the work of a Librarian when the District hired Smith, that decision effectively discriminated against Chelgren by replacing her with a less credentialed minority employee. In other words, Defendant relegated Chelgren to the position of Library Aide so it could give her job to a less qualified black employee. Chelgren's version of events, however sympathetic, ignores the facts that the Media Specialist/ Librarian position had different qualifications than Chelgren's shared position, came with additional benefits, and was never described anywhere in the record, other than by Chelgren herself, as a consolidation of her existing position. In short, the Media Specialist/ Librarian was a new position, with new and different requirements, compensation, and benefits.

Once the alleged adverse employment action is properly considered as a "failure to hire," it becomes clear Chelgren cannot show that she was qualified for the Media Specialist/ Librarian position or that Smith was less qualified than she for the job. Although there was no written description of the position, Coleman testified that its requirements and duties were explained to applicants during their interview, and among these was a requirement that the applicant possess a media teaching endorsement, also referred to as a certification in library science, as described

in the implementing provisions of the NCLBA.  Coleman told Chelgren of this requirement during her interview.  Chelgren admits she did not possess the necessary endorsement, and Harris and Coleman testified they did not recommend her for the position for this reason.  Unlike Chelgren, Smith had a Master's Degree in library science and represented on her resume that she also had an endorsement in library science.  While this last representation proved untrue, she nonetheless appeared to be the more qualified candidate at the time she interviewed.

### C. Chelgren Has Failed to Present Sufficient Evidence of Pretext

Chelgren challenges as pretext Defendant's assertion that Smith was awarded the position because she appeared to be the better qualified candidate.  Jordan, Harris, and Coleman all testified that they hired Smith on the belief that she was qualified for the position, as opposed to Chelgren, who lacked the necessary library science endorsement.  Further, they initially offered the position to Patricia Murray, a white applicant with an endorsement in library science, who turned it down.  In short, Jordan, Harris, and Coleman did not simply consider which candidate was best qualified, but which candidate had all the required qualifications.  To their knowledge, Smith and Murray did, and Chelgren did not.

In support of her pretext argument, Chelgren notes the District's response to the discovery that Smith did not possess the necessary media teaching endorsement.  While Jordan and Harris testified that they requested proof of Smith's credentials following her interview, nobody followed up on this request until nearly a year after hiring Smith.  The school business manager placed three notices in Smith's personnel file, including one addressed to Harris, and still Smith did not produce a current teaching certificate until May 18, 2007.  The production of that teaching certificate revealed that Smith had lied about possessing the requisite endorsement, the major factor that differentiated her from Chelgren in the hiring process.  Despite this, Defendant allowed Smith to remain in the position of Media Specialist/Librarian.  Unlike Chelgren, Smith did already have twelve of the required eighteen credits for the endorsement, and Defendant claims that these credit hours

were a factor in the decision to retain Smith and allow her to complete the remaining coursework by January 2008. Yet Smith never completed the remaining credits, electing to resign in December 2007 following allegations of mismanagement of library funds, repeated complaints about her management of the library, and a negative performance review. Even after Smith's resignation, Defendant allowed her to continue to work in the library as the Media Specialist/ Librarian through the end of the 2007-2008 school year.

Defendant's favorable treatment of Smith during her employment as the Media Specialist/ Librarian, whether or not it reflected good personnel management, does nothing to discredit Defendant's proffered explanation for hiring Smith over Chelgren in the first place: Smith, so far as the McKinley Elementary School administration knew, possessed the required credentials and Chelgren did not. With respect to Defendant's failure to promptly verify Smith's credentials, Chelgren has failed to connect this lag with any illicit motive in the original hiring decision. Addressing a similar set of facts, the Seventh Circuit in *Mosley* described a hypothetical "extreme case" where "an employer might be so discriminatory that it would be willing to willfully disregard the possibility that a nonminority [or, in this case, minority] is lying on his resume (or even encourage an applicant to do so) in an effort to provide cover for a discriminatory hiring decision." 216 Fed. Appx. at 598. In such a case, an extended delay in verifying an employee's credentials or the toleration of misfeasance or incompetence might support an inference of disparate treatment where there is evidence the defendant initially acted in bad faith. In this case, in contrast, there is no evidence that Defendant acted in anything other than good faith when it hired Smith. *Cf. Mosley,* 216 Fed. Appx. at 598 ("What matters is not whether the resume is true, but whether [the defendant] believed it to be true . . . .") Finally, the decision to retain Smith for the remainder of the year, however well- or ill-advised, does not in itself demonstrate that Smith received more favorable treatment than other employees due to her race.

The testimony concerning other incidents of racial bias, though troubling, does not alter the

outcome of this case. Many of htese incidents all involve qualified white applicants being denied positions in favor of purportedly less-qualified and less-experienced minority applicants. Smith, as compared to Chelgren, appeared to be the better qualified candidate at the time she applied. Similarly, the incident at the teacher's meeting and Coleman's alleged comments about white teachers postdate the decision to hire Chelgren and, in any event, do not overcome the fact that Chelgren was simply not qualified for the job when she first applied. Because Chelgren has failed to show that Smith's race, as opposed to Chelgren's inferior credentials, played a role in Defendant's hiring process, the court concludes that Defendant is entitled to summary judgment on Chelgren's claim of race discrimination.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment [44] is granted.

ENTER:

Dated: June 24, 2009

_____
REBECCA R. PALLMEYER
United States District Judge